No. 92-565

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

IN RE THE MARRIAGE OF

D.F.D.,

Petitioner and Respondent,

and

D.G.D.,

Respondent and Appellant.

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Antonia P. Marra, Bell & Marra, Great Falls, Montana

For Respondent:

Don A. LaBar, Church, Harris, Johnson & Williams,
Great Falls, Montana

Guardian Ad Litem:

Darcy Crum, James, Gray & McCafferty,
Great Falls, Montana

Submitted on Briefs: August 10, 1993

Decided: October 21, 1993

Filed: OCT 21 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The petitioner and wife, D.F.D., petitioned the District Court of the Eighth Judicial District in Cascade County for dissolution of her marriage to her husband, D.G.D., on May 29, 1991. On August 14, 1992, following numerous hearings and a trial on all issues, the District Court entered its decree dissolving the couple's marriage, awarding sole custody of their only child to the wife, restricting husband's visitation rights, and ordering that husband pay child support and maintenance. Husband appeals from the judgment of the District Court. We reverse and remand for further proceedings.

The issues are:

1. Did the District Court err when it awarded sole custody of the couple's son to the wife and restricted husband to supervised visitation?

2. Did the District Court err when it ordered the husband to pay maintenance to the wife in the amount of $150 per month for two years?

3. Did the District Court err in its calculation of child support and in its award of day care expenses?

FACTUAL BACKGROUND

D.F.D (wife) and D.G.D. (husband) were married on June 18, 1988, and separated on May 23, 1991. They had one son, J.E.D., born during their marriage on April 30, 1990.

In her petition, the wife requested dissolution of the couple's marriage, division of their property, sole custody of

2

their minor son, reasonable support, maintenance, and attorney fees. In his responsive pleading, the husband joined in her request for dissolution of their marriage, but asked that the court award joint custody of their son, and that he receive primary physical custody. He also objected to the wife's request for maintenance.

After the couple's separation, the husband filed a motion with the District Court on June 21, 1991, for temporary custody of the couple's child. He alleged that his wife had moved with their son to Lincoln, Montana, and would not allow reasonable visitation. The wife responded with her own motion for temporary custody. Although she offered no affidavit or other evidence in support of her motion, her attorney alleged in his written argument that the husband had, in the past, cross-dressed or worn women's undergarments. The wife's attorney alleged that this conduct was a form of sexual deviation which would be harmful to the couple's son if he was exposed to it.

On August 1, 1991, the District Court held a hearing to resolve the conflicting claims to temporary custody of the couple's son. As a result of that hearing, the District Court issued an order on October 30, 1991, granting the wife's motion and denying the husband's motion. The court also ordered psychological evaluations of both parents and granted visitation rights to the husband, but limited them to Saturdays and Sundays, and then only during the daytime. By then, the wife had moved to Missoula and the husband was living in Great Falls. The District Court ordered

3

that the husband could bring his son to Great Falls for visitation, so long as he was back in Missoula by that evening. Overnight visitation was denied.

Pursuant to suggestions of the court, further evaluations of the husband were performed, additional consultations regarding the possible detriment to the couple's son from the father's former behavior were obtained, and an additional pretrial hearing regarding custody and visitation was held. However, the court-ordered arrangements for custody and visitation were maintained until the court's final decree was entered.

This case was tried before the District Court on April 22, 1992, and May 13, 1992. On August 14, 1992, the District Court entered the findings of fact, conclusions of law, and decree from which the husband now appeals.

In findings which are not disputed on appeal, the District Court found that at the time of trial the wife was 31 years old, and had a high school education with additional training from Kinman Business School. At the time of trial, she was employed as a word processor at the University of Montana with a yearly gross income of $14,500 from her employment, and net income (including $300 per month temporary child support) equal to $1212 per month. The District Court found that her monthly living expenses were $1581.80, leaving a net deficit of $369.80.

The District Court found that the husband was 34 years old, had a degree in engineering from Montana State University, and was employed as an engineer. His annual gross income was $29,000.

4

However, his net income was $1882.09 per month, and his monthly living expenses were found to be $988.50. The District Court's finding regarding the husband's living expenses did not include monthly payments for attorney fees, travel to and from Missoula to exercise visitation, payments for expert witness fees and counseling, nor any allowance for housing since at the time of trial he was living with his mother in order to meet his other expenses.

Findings of Fact No. 14, 15, and 16 are vigorously contested by the husband on appeal. In Finding No. 14, the District Court found that he was an admitted transvestite and that if exposed to such conduct, his son would be irreparably harmed. The court found that transvestism was compulsive and secretive and that the couple's son could not be protected during unsupervised visitation with his father. The court found that a transvestite father cannot be entrusted with such a tender young child.

In Finding No. 15, the District Court found that the mental health of the couple's son was potentially at risk if his father deliberately or inadvertently cross-dressed in front of the child, because the child would face irreparable sexual misidentification if he saw his father as both a man and a woman. The District Court found that there was a need to protect this two-year-old from irreparable damage.

In Finding No. 16, the court found that while the wife was a fit and proper person to have custody, there was potential for harm

5

to the son if her husband inadvertently, casually, or carelessly exhibited deviate sexual behavior in the presence of the son.

As a result of these findings, the District Court awarded sole custody to the wife, and allowed visitation for the husband during two weekends per month. Visitation was allowed for one hour on Friday nights, and from 8 a.m. to 9 p.m. on Saturdays and Sundays. However, the District Court ordered that visitation had to be supervised, and in its original decree provided that supervision would be handled by the wife. The husband was to travel to Missoula on the first weekend of each month, and the wife was to travel to Great Falls on the third weekend of each month, to accommodate visitation. However, the husband was to reimburse her for gasoline expense for trips to Great Falls.

The husband was ordered to pay $49.08 per month as his proportionate share for providing insurance coverage for the couple's son, 50 percent of any uninsured medical expenses, $300 a month for child support, and $250 a month for temporary maintenance. He was also ordered to pay 65 percent of the expense already incurred for child care, and was ordered to pay 65 percent of future child care costs. Each of the parties was ordered to pay his and her own attorney fees.

Both parties moved to alter or amend the District Court's judgment. The wife wanted to change the hours of visitation, and the husband objected to maintenance, the amount ordered for child support and child care, and the District Court's findings regarding child custody and visitation. As a result of the parties'

6

post-trial motions, maintenance was reduced to $150 per month, and the court allowed visitation to be supervised by either the wife or an adult "non-transvestite member" of the husband's family. Otherwise, the court's original decree was unchanged.

I

Did the District Court err when it awarded sole custody of the couple's son to the wife and restricted husband to supervised visitation?

When we review a district court's findings which pertain to issues of child custody and visitation, those findings will be sustained unless they are clearly erroneous. *In re Marriage of Susen* (1990), 242 Mont. 10, 13-14, 788 P.2d 332, 334. Findings which are not supported by substantial credible evidence are clearly erroneous. *Interstate Production Credit Association v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. If the district court's findings upon which it bases its award of custody and visitation are not clearly erroneous, the trial court's decision will be upheld unless there is a clear showing of an abuse of discretion. *In re Marriage of Reininghaus* (1991), 250 Mont. 86, 817 P.2d 1159. However, the district court's discretion must be consistent with the statutory framework for child custody. In that regard, we must consider § 40-4-212(1), MCA, which provides that "[t]he court shall determine custody in accordance with the best interest of the child," and § 40-4-224(1), MCA, which provides that:

> Upon application of either parent or both parents
> for joint custody, the court shall presume joint custody

7

is in the best interest of a minor child unless the court finds, under the factors set forth in 40-4-212, that joint custody is not in the best interest of the minor child. If the court declines to enter an order awarding joint custody, the court shall state in its decision the reasons for denial of an award of joint custody. Objection to joint custody by a parent seeking sole custody is not a sufficient basis for a finding that joint custody is not in the best interest of a child, nor is a finding that the parents are hostile to each other.

It is clear, in this case, that the District Court based its denial of joint custody on its Findings of Fact No. 14, 15, and 16 where it found, among other things, that the husband was a transvestite, his behavior was compulsive, he could not be trusted with his son, and that if exposed to cross-dressing it would be irreparably harmful to his son. If, as argued by the husband, these findings are unsupported by any evidence, then the District Court's denial of joint custody and severe restrictions on the husband's rights to visitation were an abuse of discretion.

After a thorough review of the complete record in this case, we conclude that there was no credible evidence to support the District Court's findings which formed the basis for its denial of joint custody. However, because of the significant interests at stake for the husband, the wife, and the child in this case, we offer the following lengthy review of the evidence which leads us to that conclusion.

At the hearing held on August 1, 1991, to determine temporary custody of this couple's son, both parents testified. Also called as witnesses were Rich Kuka, a professional counselor, and the husband's mother and brother-in-law. Kuka testified that he

8

originally counseled the husband because of problems with his marital relationship, but that during the course of the counseling they had also discussed the husband's prior history of cross-dressing. As part of his evaluation of the husband, Kuka administered a battery of psychological tests, including a parenting evaluation. On the basis of those tests, his interviews, and the counseling he had done with the husband, Kuka testified that he had no concern about the husband's ability as a parent being affected by his interest in cross-dressing because it had, in the past, been a very private matter and he did not believe that the husband would ever purposely expose his son to that behavior. During the course of his testimony, the following exchange occurred with the District Court:

> THE COURT: Before you start, just tell me more about the cross-dressing. What significance does that have, if any, to this whole situation? Does that cause any problems at all or is that -- what does that signify to you?

> THE WITNESS: I personally believe that it is not an issue in regard to [D.G.D.]'s ability to parent at this time.

> THE COURT: It doesn't mean that he is a molester, or he is a homosexual, or he is a danger to the child?

> THE WITNESS: No. Absolutely not. To me it means that he has a sexual preference that involves wearing female's clothing and that's basically it.

When further asked whether or not the couple's child would be harmed if he inadvertently observed his father cross-dressing, Kuka's answer was that children could be harmed by inadvertently observing a whole range of sexual activities that normal adults engage in, but that he thought the risk was minimal.

9

Other than Kuka's testimony, there was no other expert testimony provided at the August 1 hearing. The husband testified that he had sought counseling from a number of people in Montana, but had been unable to find a counselor with prior experience with his problem. He testified that he had every intention of getting counseling and getting his problem resolved. When asked if he thought he could discontinue the behavior, which he conceded was abnormal, he testified that he thought he could. He had never publicly cross-dressed, and felt very strongly that he did not want his son to do what he had done and experience the pain that had resulted from his problem. However, neither did he want his son to grow up feeling that he had been abandoned by his father since, when the husband was four years old, his own father had died and he felt a serious void in his life without a father-son relationship.

The husband's mother testified that, even though he had grown up in her home, she had first learned that he engaged in cross-dressing in May 1991 when this dissolution proceeding was commenced. She only learned then because the husband told her.

The husband's brother-in-law testified that he had known him for 21 years, and over that time had had a lot of contact with him and considered him a good role model for children. He first became aware of the husband's prior history of cross-dressing one week before the hearing.

The wife testified that she had been married to her husband for three years and had never personally observed him in women's clothing. She only learned of it because he acknowledged the

10

problem to her after she discovered some of the clothing he had worn, which had been stored at various places in the family home. She also testified that, other than her concern with his cross-dressing, she had no concern with his parenting skills.

At the conclusion of the August 1 hearing, the husband asked for extended visitation rights. The wife objected on the grounds that there had not been a sufficient psychological evaluation to know whether extended visitation would be harmful to the couple's child. She requested further psychological evaluation and agreed if that evaluation showed that there was no risk of harm to the child, she would have no objection to extended visitation.

After the August 1 hearing, the District Judge observed that he had no personal knowledge about the subject they had been discussing, and would have to rely on the experts. He issued a temporary order disallowing any overnight visitation, and further stated that as soon as he saw some expert opinion telling him he had no reason to be concerned, he would have no reason to disbelieve that expert. That kind of expert advice was soon presented.

On November 6, 1991, the husband was evaluated by Julia R. Heiman, Ph.D., a psychologist and professor of psychiatry and behavioral sciences at the University of Washington Medical School. Her specialty is sexual disorders. She was asked to evaluate the husband for the purpose of determining whether his sexual pattern created any risk for his son.

11

Dr. Heiman interviewed the husband, reviewed the battery of psychological tests administered in Great Falls, and did some testing of her own. She concluded that while he had cross-dressed in the past, he did not fit into the medical diagnosis of transvestite, based on the fact that he had not engaged in that activity for over six months prior to the time that she had seen him. She concluded that his past conduct would not be detrimental to his son if the husband acted as a co-parent, and that based on the objective testing that was done, she believed the husband to be truthful in the history that he reported to her.

Based on what she had learned, Dr. Heiman expressed the opinion that the husband was not a compulsive cross-dresser and had a good chance of changing his behavior through treatment or therapy because he was highly motivated to do so. However, she also expressed the opinion that even if this couple's son were to observe a public exhibition of transvestism, it would be highly unusual for the child to imitate that conduct. She said that transvestism is usually learned through experimentation, rather than imitation of someone else.

Based upon this evaluation, and counseling that the husband had undergone with Dr. Monty Kuka, the brother of Rich Kuka, on December 27, 1991, the husband moved to modify the District Court's temporary custody and visitation order based on what the District Court had told him about expert opinions, and for the further reason that the wife had moved to Missoula and it was very difficult for him to travel back and forth for visitation for only

12

a few hours during the day. In response to that motion, a second hearing was held on February 19 and 20, 1992.

At that hearing, Dr. Heiman's report and deposition were submitted and Dr. Monty Kuka was also called to testify. Dr. Kuka testified that he is a licensed clinical psychologist who did a psychological evaluation of the husband in July 1991, and had seen him in weekly sessions of psychotherapy since November 1991. He found nothing in the husband's psychological test results to concern him about the husband's effectiveness as a parent or the role model that he would provide to his son. To the contrary, he testified that he found the husband skilled in a lot of areas of parenting to a degree that is well above average. Dr. Kuka reviewed Dr. Heiman's deposition and report and found nothing that was contradictory with his own conclusion.

Dr. Kuka testified that the psychotherapy the husband had undergone went very well, the husband was highly motivated and cooperative, and followed all of Dr. Kuka's instructions. He testified that in conducting his evaluation, his primary concern was for the well-being of the couple's child, but that he felt the husband would be a truly effective parent who has the qualities that are basic to establishing a good relationship with the child. He concluded that, as a result of the counseling the husband had undergone, the husband was no longer involved in cross-dressing. He did not consider the husband a compulsive cross-dresser, and when asked by the court about the risk to the child from observing his parent dressed in female undergarments, Dr. Kuka testified

13

that, in the very unlikely event that the husband was observed by his son, any damages could be dealt with in a way that would minimize the impact on him. He further testified that, in his opinion, the positive experiences from a normal father-son relationship far outweighed the minimal negative impact about which he was asked to speculate. He testified:

> Q. So what you are telling us is that it's more valuable for him to grow up with a parent that appears to have the skills that [D.G.D.] has compared to the risk that this child may turn out to be a transvestite?
>
> A. Yea. Because I don't see that that is a real risk. And I do see the real value.

Dr. Kuka testified that to deprive a child of a relationship with a parent is extremely destructive to their development, while the unlikely event of the same child inadvertently observing his father in inappropriate garments would be no worse than children seeing their parents engage in sex, or physical violence, or fighting within the home. He explained that, although he felt that eventuality was unlikely, any traumatic effect could be minimized with proper communication and explanation.

The husband testified that at the time of the hearing he had not had any items of women's clothing in his possession since November 1990, and had no intention of ever possessing any again.

In spite of this evidence, with which the wife said she would be satisfied, and in spite of her acknowledgement that she had never even seen her husband cross-dress, the wife objected to expanded visitation privileges until a further report could be

14

obtained from a psychologist of her choice who specialized in child development.

At the conclusion of the hearing, the District Court observed that both parents appeared to be good parents and that if it were not for the issue of transvestism (even though Dr. Heiman had testified that the husband was not a transvestite), he would not have any concerns. The judge acknowledged that he was having difficulty with the issue, largely out of ignorance, because he did not understand transvestism.

The District Court accepted Dr. Kuka's testimony, but expressed reservation that Dr. Kuka was an expert in child development with very limited experience in transvestism. The wife and her attorney, on the other hand, objected to Dr. Heiman's testimony because she was an expert in transvestism with very little experience in child development.

For these seemingly contradictory reasons, the District Court decided to maintain the status quo pending further expert consultation. On February 24, 1992, the District Court entered an order denying the husband extended visitation.

Because of the wife's concerns, her attorney requested an opinion from Richard Green, M.D., a psychiatrist from the staff of the UCLA Medical School. Dr. Green submitted a report to the wife's attorney on February 20, 1992. Although a portion of that report is referred to in the District Court's findings, when the entire text of the report is considered, it is totally consistent with the prior expert testimony. In fact, the report was offered

15

at the parties' April 22, 1992, trial by the husband's attorney and admitted by the District Court over the objection of the wife. Some of the more significant points in Dr. Green's report are that, in his study of children with sexually atypical parents, he has found no evidence of a sexual identity conflict. He advised that no cross-dressing by the husband take place in the boy's presence for the next few formative years. However, there was not much chance of that since the husband had never cross-dressed in anyone's presence in the previous 20 years that he had engaged in the activity.

Dr. Green also pointed out that to the extent the husband could provide assurance that cross-dressing would not occur, he should have the same visitation opportunity as any father where cross-dressing is not an issue. In terms of supervision of visitation, he said he would defer to the clinician who was seeing the father for therapy. That clinician was Dr. Monty Kuka.

Importantly, Dr. Green also concluded that the more time a boy can spend with his father, the more available will be a male for appropriate sexual identification. He concluded that there was no evidence that transvestism by a father affects parenting qualities, nor was there any evidence that fathers who cross-dress are inclined to sexually abuse children, any more than any other adult male.

With this fourth expert opinion in the husband's favor, the final trial in this matter was held on April 22, 1992. At that trial, Dr. Monty Kuka was again called as a witness. He testified

16

that by the time of trial he had discontinued his therapy sessions with the husband because he felt the husband had identified and dealt with his problem of cross-dressing. In his opinion, there was not a risk that the husband would cross-dress in the future. He testified that in all the custody evaluations he had done, the husband was one of the most qualified parents, whether being considered for shared custody or sole custody, that Dr. Kuka had ever encountered. He testified that even if the husband cross-dressed again, which he felt was unlikely, and even if his son observed it, which he felt was even more unlikely, he did not think that observation presented a significant risk of a negative impact on the behavior of his child. He pointed out that based on Dr. Green's studies, even radical changes in the sex role of a parent had not had a major impact on children who had been studied.

At the time of trial, the husband testified that he had not cross-dressed for a year and a half, and was able to assure the court that he would never do something like that in the presence of his son.

Raymond Kelly testified that he had been a friend of the husband since the third grade, and they were roommates in college. They had stayed in touch ever since. Kelly stated that he was not aware that the husband had engaged in cross-dressing until the trial, and he only knew then because the husband had told him.

On January 30, 1992, at the husband's request, the court had appointed a guardian ad litem to represent the interests of the couple's son. On April 22, 1992, she filed her report to the

17

court. In her report, she indicated that she had conducted her own independent investigation and found nothing from that investigation which would indicate that the husband's past dressing habits should disqualify him as a custodial parent. She pointed out that no one had ever seen him cross-dress, and that he appeared to be able to control the behavior. She recommended joint custody, with physical custody to the wife during the week, and custody for the husband on alternating weekends. She also recommended that the parties share physical custody of their son during summer months.

Other than those experts whose testimony is summarized in this opinion, no other expert was called as a witness in this case, nor were reports from any other experts submitted to the District Court. In spite of the overwhelming evidence that the husband presented no risk to his son, and that the only real risk to this child's normal development was by limiting him from a normal relationship with his father, the District Court entered the findings and decree which are the subject of this appeal.

The court found that the husband was an admitted transvestite. The husband was not an admitted transvestite and was not qualified to make that diagnosis. Dr. Heiman, who was qualified, testified that the husband was not a transvestite.

The court found that if the parties' son was exposed to such role modeling (cross-dressing), he would be irreparably harmed. There was no such evidence. That was the contention of the wife and her attorney. However, every one of the four experts who expressed an opinion in this case opined to the contrary.

18

The District Court found that transvestism is obviously compulsive and secretive. All of the experts who were asked testified to the contrary. The husband did not feel that his conduct was compulsive, and in fact, had not engaged in it for two years at the time of the hearing on his motion to amend the District Court's findings.

The District Court found that the child's mental health is potentially at risk and that the child faced irreparable sexual misidentification if he saw his father cross-dress. This finding was directly contrary to all of the competent evidence in this case. This was the concern repeatedly expressed by the District Court because this was the position repeatedly argued by the wife and her attorney. However, everyone qualified to draw such an opinion disagreed with that conclusion.

At the September 18 hearing to consider the parties' motions to amend, Dr. Kuka was again called as a witness to address the kind of supervised visitation that the District Court had provided for in its decree. He testified that based on his familiarity with the husband, and his familiarity with the opinions of the other experts who had been involved in this case, there was no reason to have supervision of visitation and that that kind of limitation would have a negative affect on the child by limiting natural interactions with his parent. Dr. Kuka felt in this case that it would create tension, disharmony, and a discomfort which limited the spontaneity and enjoyment of the visitation. He reviewed the District Court's decree and expressed the opinion that Dr. Green's

19

statement had been taken out of context and specifically disagreed with the District Court's conclusion that any potential danger to the couple's son had been established.

Dr. Kuka expressed the opinion that Dr. Green's letter was very clear in its conclusion that there was not a risk of gender confusion, even in the families of transsexuals and homosexuals. He said that the situation in this case was significantly less confusing.

Dr. Kuka's testimony was interrupted by the District Court and he was asked "[w]hat if the boy walked in the room and saw his "old man" dressed up in panties and bra?" Dr. Kuka's response was that he did not think there was any risk that that would happen, but that, even if it did happen, it would be confusing to the son but not traumatic. He unequivocally stated that kids are able to understand the difference between cross-dressing and normal behavior. He testified that while he understood the court's concern about the welfare of this child, his concern was for the welfare of a child who is not allowed to see his father on a natural basis.

The husband admittedly engaged in private behavior which most people would find offensive. He, himself, found his conduct so offensive that he put off seeking help for years out of fear that he would be publicly ridiculed and humiliated. However, out of commitment to a normal relationship with his son, he has now gotten the help that he needs. He no longer engages in the conduct which the District Court finds offensive, and everyone who is qualified

20

to express an opinion has advised the District Court that any remote risk to his son is far less that the risk caused by the unnatural restrictions that have been placed by the District Court on his relationship with his son.

By statute in Montana, custody is to be based on a child's best interest, and joint custody is favored unless there is some compelling reason to order otherwise. In this case, we conclude that the custody and visitation arrangement ordered by the District Court was contrary to the child's best interest and there was no evidence, other than the District Court's unfounded fears, to deny joint custody.

The uncontroverted evidence was that, although the husband had begun privately cross-dressing as a teenager, no one had ever seen him cross-dress. Not his mother, nor his sisters with whom he was raised; not his childhood friend who lived with him for four years as a college roommate; and not even his wife with whom he lived until this dissolution proceeding was commenced.

There was further evidence that the husband despised the fact that he had cross-dressed in the past, but was afraid to acknowledge his problem until he had no choice. Once he did so, he entered intensive therapy, which, according to his counselor, had been successful to the point that he had not cross-dressed, even privately, for two years prior to the trial which led to the court's decree.

The husband's counselor, whose testimony was undisputed, expressed the unequivocal opinion that this man would not

21

cross-dress in the future, that even if he did, it would be a very private matter as it had been in the past, and that there was no risk of observation by his son. However, even assuming that, contrary to the counselor's expectation, the husband did cross-dress, and further assuming, contrary to all prior behavior, his cross-dressing was observed by his son, every counselor who testified in this case testified that the negative impact on the son would be less than the impact from not having a normal relationship with his father. The uncontroverted evidence was that supervised visitation during the daytime on alternate weekends was not conducive to a normal relationship between this child and his father.

We conclude, based on the above discussion, that the District Court erred by awarding sole custody of this couple's son to the wife and by requiring that the husband's visitation with his son be supervised. We reverse that part of the District Court judgment and remand to the District Court for a determination of custody and visitation consistent with the recommendation by the child's guardian ad litem, based on our conclusion that there is no substantial evidence which indicates that a custody or visitation arrangement, other than as suggested by the guardian ad litem, would be in the best interest of this couple's minor child.

II

Did the District Court err when it ordered the husband to pay maintenance to the wife in the amount of $150 per month for two years?

Awards of maintenance are authorized pursuant to § 40-4-203, MCA, under the following circumstances:

(1) In a proceeding for dissolution of marriage . . . the court may grant a maintenance order for either spouse only if it finds that the spouse seeking maintenance:

(a) lacks sufficient property to provide for his reasonable needs; and

(b) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

(2) The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to marital misconduct, and after considering all relevant facts including:

(a) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(b) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(c) the standard of living established during the marriage;

(d) the duration of the marriage;

(e) the age and the physical and emotional condition of the spouse seeking maintenance; and

(f) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

23

The standard of review for a maintenance award is whether the District Court's findings are clearly erroneous. *In re Marriage of Eschenbacher* (1992), 253 Mont. 139, 142, 831 P.2d 1353, 1355.

The District Court made three findings critical to its maintenance award. In Finding No. 12, the court found that the wife had greater expenses than income each month by an amount of $369.80. In Finding No. 13, the court found that the husband had $988.50 more income each month than he had expenses. And in Finding No. 24, the court found that while the wife did not have sufficient income or property to meet her needs, the husband did have sufficient income after expenses to pay the wife $250 per month for maintenance for two years. In its post-trial amendment to its decree, the District Court reduced that amount to $150 per month.

On appeal, the husband does not dispute that the wife has insufficient income or property to meet her needs. He does, however, argue that the evidence did not support the District Court's finding that he had disposable income after paying his monthly expenses, and therefore, the District Court's award of maintenance was an abuse of discretion because it did not properly consider his ability to pay, as required by § 40-4-203(2)(f), MCA.

The husband's specific argument is that the District Court's findings regarding his disposable income did not take into consideration the amount of money that he had to spend each month for travel expense to exercise his visitation rights; the amount of

24

debt he had incurred for attorney fees and expert witness fees, the cost of counseling, and the cost of housing. He contends that after consideration of these expenses, he had no disposable income at the end of each month, and therefore, had no ability to pay maintenance.

During trial on April 22, 1992, the husband testified that he had spent approximately $3000 on travel expenses to exercise his visitation rights since he and his wife had separated and she had moved to Missoula. He explained that in addition to the expense of driving to and from Missoula, he had to pay the cost of a motel room for three nights per weekend in order to have a place to stay and to take his child.

He testified that at the time of trial the total amount he owed for attorney fees, expert witness fees, and counseling fees was $9916, and that he was attempting to pay off a $500 debt to his therapist at the rate of $100 to $150 per month.

In addition, the husband testified that he was living with his mother because he was unable to afford housing and still pay for his travel expenses and legal expenses. However, he hoped to be able to move into his own apartment or home in the future, and estimated that a reasonable cost for rent or a house payment would be $450 a month.

The husband testified that even while living with his mother and having no expense for housing, his monthly living expenses, without repayment of his debts, were $1700.

None of the husband's testimony regarding the expense of his travel to exercise visitation, the amounts owed to his attorneys, expert witnesses, and conselors, or the reasonable cost of housing, were contested by the wife. However, none of these expenses are mentioned in the District Court's Findings No. 12, 13, or 24. Therefore, we are unable to conclude whether the District Court considered these expenses or whether, after consideration of these expenses and a reasonable allowance for repayment of these debts, the husband has the financial ability to meet his needs and still pay maintenance. If, after consideration of all his expenses, he has no money left at the end of each month, it is an abuse of discretion to require that he pay maintenance. Therefore, we vacate the District Court's maintenance award and remand to the District Court for further findings regarding the husband's ability to make maintenance payments after consideration of all of his monthly expenses and needs.

### III

Did the District Court err in its calculation of child support and in its award of day care expenses?

The standard of review for a child support award is whether the district court abused its discretion. *In re Marriage of Nash* (1992), 254 Mont. 231, 235, 836 P.2d 598, 601. In resolving that issue, we need consider § 40-4-204, MCA (1991), which provides, in relevant part, that:

> (3)(a)    Whenever a court issues or modifies an order concerning child support, the court shall determine the child support obligation by applying the standards in

26

this section and the uniform child support guidelines adopted by the department of social and rehabilitation services pursuant to 40-5-209, unless the court finds by clear and convincing evidence that the application of the standards and guidelines is unjust to the child or to any of the parties or is inappropriate in that particular case.

This case originally went to trial on April 22, 1992. Both parties submitted proposals for child support based upon the child support guidelines in effect at that time. Their proposals are summarized, as follows, in the District Court's Finding No. 19:

That each party presented calculations with respect to child support based on the Montana Child Support Guidelines. Those child support calculations varied from $291.00, as computed by petitioner, to $313.83, as computed by respondent.

Based upon these calculations, the District Court ordered that the husband pay child support in the amount of $300 per month.

On July 31, 1992, subsequent to trial but prior to the District Court's entry of its decree, new child support guidelines were enacted. These were not available to the parties, nor the court, when they submitted their proposed findings, conclusions, and judgment. Neither did the District Court have reason to know that they would apply to its decision. However, we have recently held that district courts are to determine child support obligations according to guidelines in effect at the time that the court makes its decision. *Paternity of W.L.* (Mont. 1993), 855 P.2d 521, 50 St. Rep. 751.

Among the changes in the new child support guidelines is an amendment to Rule 46.30.1543, ARM, which provides that the amount of child support set forth in the guidelines may be varied, based

27

on a number of factors, including the cost of exercising long distance visitation.

For these reasons, both parties submitted revised child support work sheets to the District Court in support of, and in opposition to, the husband's motion to alter or amend the District Court's decree.

In her amended work sheet, the wife proposed a child support obligation of $271 with maintenance, and $331 without maintenance. The husband proposed support in the amount of $193.89 with maintenance, and $225.47 without maintenance. However, he argued that the amount should be further reduced due to his travel expenses which are necessarily incurred to exercise visitation. At that time, he alleged that that amount was $220 per month.

The husband also objected to the District Court's finding that he was obligated to pay a proportionate share of the child care expenses incurred from the date on which the parties separated until the date of judgment.

In its order entered in response to the parties' post-trial motions, the District Court did not address the new child support guidelines, nor did it address what allowance, if any, should be made for the expenses incurred by the husband to exercise his visitation rights. Both parties agree that the husband's child support obligation will also be affected by the District Court's resolution of the maintenance issue which we have instructed it to revisit on remand. Therefore, we vacate the District Court's award of child support and remand to the District Court for further

28

consideration of the husband's child support obligation under the new child support guidelines, and consideration of what effect, if any, should be given to the fact that the husband necessarily incurs expense each month in order to exercise his visitation rights.

We conclude, however, that the District Court did not err by providing in its decree for payment by the husband of his proportionate share of child care expenses incurred subsequent to the parties' separation and prior to the date of the District Court's decree. Apportionment of expenses for child care is specifically authorized by the new child support guidelines.

The judgment of the District Court is reversed and remanded for further proceedings consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

29

Chief Justice J. A. Turnage dissenting:

For the following three reasons, I respectfully dissent: 1) the highly unusual nature of D.G.D.'s past behaviors and practices, not all of which are described in the majority opinion; 2) the impossibility of guaranteeing that such behaviors and practices will not occur again and will not affect the minor child; and 3) the District Court's responsibility to protect the best interests of the child.

I would affirm the court's discretion in ordering supervised visitation while the child is at a particularly vulnerable stage of his development.

_____
Chief Justice

October 21, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Antonia P. Marra, Esq.
Bell & Marra
9 Third St. No., Ste. 201
Great Falls, MT 59401

Don A. LaBar, Esq.
Church, Harris, Johnson & Williams
P.O. Box 1645
Great Falls, MT 59403

Darcy Crum, Esq.
James, Gray & McCafferty
P.O. Box 2885
Great Falls, MT 59403

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy